[Cite as *State v. Glowney & Glowney*, 2019-Ohio-3390.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case Nos. 27896 & 27897 |
| | : | |
| v. | : | Trial Court Case Nos. 2016-CRB-2409 |
| | : | & 2016-CRB-2410 |
| LINDSEY GLOWNEY & JOSHUA | : | |
| GLOWNEY | : | (Criminal Appeal from |
| | : | Municipal Court) |
| Defendants-Appellants | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 23rd day of August, 2019.

. . . . . . . . . . .

NOLAN C. THOMAS, Atty. Reg. No. 0078255, Kettering City Prosecutor, 2325 Wilmington Pike, Kettering, Ohio 45420
        Attorney for Plaintiff-Appellee

PAUL R. LEONARD, Atty. Reg. No. 0031006, 1670 Penbrooke Trail, Dayton, Ohio 45459
        Attorney for Defendants-Appellants

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} After the trial court overruled their motion to suppress, Joshua Glowney and Lindsey Glowney pled no contest in the Kettering Municipal Court to one count each of cruelty against companion animal in violation of former R.C. 959.131(C)(2).[1] In exchange for the pleas, two additional counts of animal cruelty were dismissed for each defendant. The trial court sentenced them to seven days in jail, all of which was suspended, plus a $100 fine, with one year of unsupervised probation. The court stayed their sentences pending appeal.[2] Upon the Glowneys' motion, we have consolidated their cases for appellate review.[3] For the following reasons, the trial court's judgments will be affirmed.

## I. Facts and Procedural History

{¶ 2} The State's evidence at the suppression hearing established the following

---

[1] R.C. 959.131 was amended effective September 13, 2016, approximately one month prior to this offense. At the time of the offense, R.C. 959.131(C) stated, "No person shall knowingly cause serious physical harm to a companion animal." R.C. 959.131(C) currently has no subparts and is a felony of the fifth degree. *See* R.C. 959.99(E)(2). However, under the prior version, R.C. 959.131(C)(2) read: "No person who confines or who is the custodian or caretaker of a companion animal shall negligently do any of the following: * * * (2) Omit any act of care by which unnecessary or unjustifiable pain or suffering is caused, permitted, or allowed to continue, when there is a reasonable remedy or relief, against the companion animal[.]" Former R.C. 959.131(C)(2) was a misdemeanor of the second degree. *See* former R.C. 959.99(E)(2) (effective Sept. 28, 2013 to Sept. 12, 2016). Although the complaint charging this offense originally indicated that the offense occurred on October 10, 2016, the complaint was subsequently amended to reflect a date range of July 23, 2015 to September 12, 2016, when the former statute was in effect.

[2] Lindsey Glowney also pled no contest to allowing their dog to run at large in violation of Kettering City Ordinance 618.02, for which she received a $25 fine and court costs. Mrs. Glowney satisfied the judgment and did not appeal that conviction.

[3] The Glowneys' cases were not formally consolidated in the trial court. However, they had the same defense counsel, the filings in their cases are virtually identical, and the court held joint hearings in their cases.

facts.

**{¶ 3}** Shortly before 3:00 p.m. on October 10, 2016, which was Columbus Day, Deborah Smith drove along Cushing Avenue in Kettering as she returned to her home a short distance away on a neighboring street. As she was driving in the 600 block, she noticed the occupants of an oncoming minivan looking toward a particular house. Smith looked as well, and she saw an "extremely thin" brown dog (later identified as the Glowneys' male dog, Dyson) that appeared to be undernourished; the dog was not leashed or confined in a fenced yard. Smith testified that she became "very upset, in shock," because she had never seen a dog that looked like that, and she pulled over to see if anyone knew who owned the dog. The driver of the minivan, who had also pulled over, did not know who owned the dog, so Smith called the Kettering police. While waiting for an officer to respond, Smith saw the dog run into the backyard of 640 Cushing and then into the backyard of 636 Cushing, the Glowneys' residence, which had a partially-opened gate. Smith took mesh netting from her vehicle and loosely tied the gate shut, not knowing if the dog was in its own yard.

**{¶ 4}** Animal Control Officer Shelly Davis was dispatched to Cushing Avenue, and was greeted by two women, one of whom was Smith. The women told Davis that the dog had gone into the backyard, and they pointed to the house next to the Glowneys' yard. Smith reported to Davis that the dog had been in the street, but had gone into the backyard of 640 Cushing to get to 636 Cushing.

**{¶ 5}** Officer Davis, Smith, and the other woman went into the backyard of 640 Cushing and saw the dog on the back deck of 636 Cushing, apparently trying to get in the back door. Davis described the dog as nervous, and testified that it was barking at

them.    Davis went into the backyard of 636 Cushing to secure the dog.    She put a leash on Dyson, took him to her van, and gave him food and water.

{¶ 6} On cross-examination, Officer Davis was asked about the need for a search warrant before entering the Glowneys' property to seize the dog.    Davis testified that she needed a warrant to remove a confined animal, but not an animal at large.    Davis did not believe that Dyson had been confined, because he was not on a secure tether or in a securely fenced area.    Davis testified that the gate to the backyard had been open.

{¶ 7} Officer Davis noticed the dog's poor body condition.    She testified that he had no muscle mass, that his skull was sunken in where there should be muscle mass, that his shoulder blades, spine, and hip bones were protruding, his abdomen seemed distended, his spine was visible down through his tail, and he had a lot of hair loss on his legs.    The dog also was walking on his toenails.    Officer Davis asked another officer to come and take photos of the dog.    Davis testified, however, that she was, at this point, just investigating a loose dog complaint.    She stated that she did not assume that the dog was a victim of cruelty or neglect, because he could have had a medical condition.

{¶ 8} Dyson had a collar with an old license,[4] but Davis was unable to confirm his ownership on the Montgomery County Auditor's website.    Smith and the other woman did not know who owned the dog; both told Davis that they had not seen the dog before. At that point, Davis still did not know if Dyson belonged at 636 Cushing, and she testified that some dogs will try to get into any house to be safe.    Davis knocked on the door at 636 Cushing, but received no response.

---

[4] Officer Davis testified that it was a 2010 license, but the Montgomery County Animal Resource Center veterinarian stated that it was a 2014 license.

**{¶ 9}** Officer Davis left a written notice on the Glowneys' door to contact her. The notice was a "Kettering Police Department Warning Notice" that stated that the police had "received a complaint about your pet." The box for "Dogs or other animals running at large (Ordinance #618.03)" was checked. Handwritten at the bottom was "*Condition of dog. Please call within 24 hours." Officer Davis included her cell phone number. The notice was dated October 10, 2016 with a time of 3:25 p.m.

**{¶ 10}** Due to Dyson's apparent poor health and the fact that the Montgomery County Animal Resource Center (ARC) was closed for the holiday, Davis called Dr. Elizabeth Maimon of Hills and Dales Veterinary Clinic, where Davis had previously worked, and asked Dr. Maimon if she would look at Dyson. Dr. Maimon agreed. Dr. Maimon weighed Dyson, took his temperature, trimmed his nails, gave him subcutaneous fluids, and provided him highly-digestible food. While Dyson was at Dr. Maimon's office, the Kettering dispatcher was able to contact ARC personnel, who agreed to meet Davis at ARC. Davis then took Dyson to ARC, where he was evaluated and held.

**{¶ 11}** Mr. Glowney, who was out-of-town, left a message for Officer Davis that evening. Officer Davis spoke with Mrs. Glowney during the following week. Mrs. Glowney confirmed that Dyson was her dog, and she provided information about Dyson's veterinarian, license, and rabies vaccination. Mrs. Glowney was not certain when Dyson last had been seen by a veterinarian, but she told Officer Davis that he was seen at Bigger Road Veterinary Clinic. Officer Davis told the Glowneys that Dyson was under veterinary care at ARC, and she (Davis) obtained Dyson's veterinary records from Bigger Road Veterinary Clinic. Officer Davis stated that she waited to hear from ARC's veterinarian to determine whether to charge for cruelty or neglect.

{¶ 12} On October 11, 2016, Dr. Kelly Meyer, veterinary supervisor at ARC, received text communications from an ARC veterinary technician, who had triaged Dyson. Dr. Meyer learned that an extremely malnourished dog was admitted from Kettering animal control, and that Dyson needed initial supportive care. Dr. Meyer received photos of Dyson from the technician. Dr. Meyer stated that Dyson was scanned for a microchip, but no microchip was located.

{¶ 13} Dr. Meyer examined Dyson the following day. She stated that she used two scales (Tufts University Scale and Purina Scale) to determine Dyson's body condition. Under the Tufts scale (1 to 5), Dyson was a one, which was extremely emaciated. Under the Purina scale (1=emaciated, 5=perfect, 9=extremely obese), Dyson was a "one down to zero." Dr. Meyer determined that Dyson was extremely malnourished and had cachexia, meaning his body was feeding on its own proteins. She started Dyson on multiple small meals and fluids.

{¶ 14} Dyson gained one pound the first day. Over the next couple of days, his weight gain slowed and stopped. Dyson was eating normal amounts of food at multiple daily feedings, but was not thriving and gaining weight as she would have expected. Dr. Meyer received Dyson's medical records on October 13, 2016. She did not communicate with the Glowneys, because Officer Davis was the presenting officer.

{¶ 15} Dyson's condition deteriorated on October 14. On the morning of October 15, Dr. Meyer learned that Dyson had not eaten overnight, apparently was not drinking water, and had a painful mass on his abdomen. Dr. Meyer expressed concern to Robert Sexton, ARC's animal care and control officer supervisor, that Dyson was declining quickly and further diagnostic work may only prolong his suffering. Dr. Meyer testified

that Dyson was not showing the kind of progress that she would expect of a dog that was simply not being fed, and she believed there was an underlying disease process that they were beginning to investigate, but his suffering was too great. Dr. Meyer stated that she took into account the stressfulness of the situation for Dyson. She determined that euthanasia was necessary.

{¶ 16} That day, Dyson was euthanized. A necropsy showed that Dyson had suffered from liver disease, likely liver cancer, which caused malabsorption of nutrients and an inability to gain weight. The Glowneys learned of Dyson's death on October 20.

{¶ 17} Lindsey Glowney testified at the suppression hearing on her and her husband's behalf. She stated that they had adopted Dyson as a puppy and have another cat and dog. She testified that Dyson's collar had a license, and he was microchipped.

{¶ 18} On October 10, 2016, Mr. Glowney was out of town for work, and Mrs. Glowney worked from 8:00 a.m. to 5:00 p.m. Dyson had eaten his breakfast that morning. Mrs. Glowney went home for lunch and let the dogs out. Their other dog, Poncho, wanted to come back in, but Dyson wanted to stay outside. Mrs. Glowney left Dyson outside when she returned to work, leaving him fresh water. When she returned home, there was a note to call about the condition of the dog. She called her husband, who called Officer Davis's number.

{¶ 19} Mrs. Glowney testified that she made numerous attempts to contact ARC by telephone and email during the next week. On October 11, Mrs. Glowney was driving to ARC when she spoke with Officer Davis, who told her that ARC had a hold on Dyson and she (Mrs. Glowney) would not be able to get him. On October 12, Officer Davis told Mrs. Glowney that the ARC vet would be unable to see Dyson that day due to jury duty.

On October 13, Mrs. Glowney spoke with Davis to make arrangements for Davis to see Poncho; at that time, Davis told Mrs. Glowney that Dyson was waiting on the vet. On October 14, Officer Davis came and saw Poncho. Officer Davis told Mrs. Glowney that Dyson was doing better and had gained two pounds; Davis asked about Dyson's records. After Officer Davis obtained Dyson's records from Bigger Road Veterinary Clinic, Davis asked Mrs. Downey why they had not gone back to the vet. Mrs. Glowney testified that she told Davis that the veterinarian assumed Dyson's digestive issues were due to his age and did not say anything about the need to follow up. Davis told Mrs. Glowney that ARC would not allow her to see Dyson. When Mrs. Glowney asked if he would be put down, Officer Davis told her "no" because "she [Davis] would know something by then."

{¶ 20} On October 15, Mrs. Glowney got a call from Davis telling her to call ARC when it opened at 10:00 a.m. Mr. Glowney called then and again on October 17, but the Glowneys were not provided information about Dyson. The Glowneys learned of Dyson's euthanasia on October 20.

{¶ 21} Mrs. Glowney testified that she was never notified of the right to a hearing or to contest the seizure of Dyson. She testified that she did not give Officer Davis the right to come onto her property on October 10. Further, she stated that she was not notified of the decision to euthanize Dyson or of her right to contest that decision.

{¶ 22} Defense counsel also called Dr. Maimon to testify, and she described how she came to see Dyson, her examination of him, and her provision of palliative care. She stated that her records showed that Dyson was a stray. She had checked for a microchip and found none.

{¶ 23} On October 21, 2016, the Glowneys each were charged by complaint with

cruelty against companion animal, in violation of former R.C. 959.131(C)(2), a misdemeanor of the second degree. Lindsey Glowney was also charged with violating Kettering City Ordinance 618.02 (control of dogs) by allowing her dog to run at large. The Glowneys appeared, entered pleas of not guilty, and waived their speedy trial time. On February 1, 2017, the Glowneys were further charged by complaint with violating R.C. 959.131(D)(1) and (2), both also misdemeanors of the second degree.

{¶ 24} During the pendency of their cases, the Glowneys filed numerous motions, including a motion to present evidence of their other dog, a motion in limine, a motion for compliance with *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed.2d 215 (1963), motions for continuances, motions to dismiss, and motions to suppress. Of relevance to this appeal, on June 14, 2017, the Glowneys filed a motion to suppress, claiming that the State violated their right to due process by failing to provide appropriate notices to them and that the State violated their constitutional rights under the Fourth, Sixth, and Fourteenth Amendments when Officer Davis seized Dyson, when ARC personnel failed to provide information about Dyson, when Dyson was euthanized, and when his collar was lost.

{¶ 25} The trial court held a hearing on the motion on July 12, 2017 and August 9, 2017. At the beginning of the hearing, defense counsel presented testimony from Lindsey Glowney to establish that the Glowneys had standing to bring their motion to suppress. Following her testimony, the court concluded that the Glowneys had standing. The State then presented the testimony of Officer Davis, Deborah Smith (the neighbor who called 911), and Dr. Meyer. The defense called Lindsey Glowney and Dr. Maimon. In lieu of closing argument, the parties filed post-hearing memoranda.

{¶ 26} On October 20, 2017, the trial court overruled the motion to suppress, concluding that Officer Davis lawfully seized Dyson as part of her community caretaking functions. The court further concluded that the notice requirements of R.C. 959.132(C) did not apply to the seizure of an unregistered dog running at large and noted that the Glowneys had received a written notice to which they had responded.

{¶ 27} On January 25, 2018, the Glowneys each entered a no contest plea to one count of cruelty to companion animal in violation of former R.C. 959.131(C)(2), in exchange for which their two additional counts under R.C. 959.131(D) were dismissed. Lindsey Glowney also pled no contest to having an animal at large. As stated above, the trial court sentenced them to a suspended term of seven days in jail, plus a $100 fine, with one year of unsupervised probation. The trial court ordered Lindsey Glowney to pay an additional $25 fine plus court costs for having an animal at large.

{¶ 28} The Glowneys appeal from their convictions for cruelty to companion animal. Their original appellate brief raised four assignments of error. The first three assignments challenged the trial court's ruling on their motion to suppress. The fourth claimed that the court erred in finding them guilty on their no contest pleas due to errors at the plea hearing, including the lack of a waiver regarding the required explanation of circumstances.

{¶ 29} In response to the fourth assignment of error, the State moved for a remand to the trial court for correction of the plea hearing transcript; they argued that Mrs. Glowney's waiver of the explanation of circumstances was audible on video recording of the plea hearing, but it was not included in the transcript. The Glowneys argued in response that she made no such statement. We granted the motion and remanded to

the trial court for a determination on whether the transcript was correct. The trial court subsequently determined that Mrs. Glowney responded affirmatively to whether she would waive the explanation of circumstances, and an amended transcript was filed. The trial court denied the Glowneys' motion for reconsideration of that decision. The Glowneys have filed a supplemental notice of appeal regarding these two decisions. The Glowneys subsequently filed a revised appellate brief, which raises a fifth assignment of error challenging the amendment of the plea hearing transcript.

## II. Review of Suppression Ruling

{¶ 30} In their first, second, and third assignments of error, the Glowneys assert that the trial court erred in denying their motion to suppress. Specifically, they claim:

1. The trial court erred in not finding that Kettering Community Service Specialist, Shelly Davis, violated both the federal (Fifth Amendment) and state (Section 16, Article 1) constitutional rights of Defendants-Appellants, guaranteeing procedural due process of law mandated in O.R.C. 959.132.

2. The trial court erred in not finding a violation of the protections against unlawful search and seizure of Defendants-Appellants' property, and the seizure of Dyson and his collar with license attached, by Kettering Community Service Specialist, Shelly Davis, which violated both federal (Fourth Amendment) and state (Section 14, Article 1) constitutional rights.

3. The trial court erred in not finding that the Animal Resource Center and Kelly Meyer violated both federal and state constitutional rights of Defendants-Appellant, guaranteeing procedural due process of law mandated in the U.S. (Fifth Amendment) and Ohio constitutions (Section

16, Article 1) by not providing notice and a hearing before the destruction of Dyson and his collar and license.

**{¶ 31}** In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

### A. Fourth Amendment – Seizure of Dyson

**{¶ 32}** The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment was directed." (Citation omitted.) *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). "The curtilage is an area around a person's home upon which he or she may reasonably expect the sanctity and privacy of the home. * * * Because the curtilage of a property is considered to be part of a person's home, the right of the police to come into the curtilage is highly circumscribed. * * * Absent a warrant, police have no greater rights on another's property than any other visitor has. * * * The only areas of the curtilage where the officers may go are those impliedly open to the public." *State v. Peterson*, 173 Ohio App.3d 575, 2007-

Ohio-5667, 879 N.E.2d 806, ¶ 17 (2d Dist.); *see also State v. Holloway*, 2d Dist. Clark No. 2017-CA-91, 2018-Ohio-4636, ¶ 35.

**{¶ 33}** It is a basic principle of Fourth Amendment law that searches and seizures inside a person's home without a warrant are presumptively unreasonable. *Kentucky v. King*, 563 U.S. 452, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011); *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In general, searches within a home must be pursuant to a warrant supported by probable cause to believe that a crime has been or is being committed. *E.g., Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). However, the United States Supreme Court has recognized limited exceptions to both the warrant and probable cause requirements, emphasizing that "[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness.' " *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006); *see also Griffin*. The State has the burden of showing the validity of a warrantless search. *State v. Hilton*, 2d Dist. Champaign No. 08-CA-18, 2009-Ohio-5744, ¶ 21-22, citing *Xenia v. Wallace*, 37 Ohio St.3d 216, 218, 524 N.E.2d 889 (1988).

**{¶ 34}** One such exception is the community caretaking/ emergency aid exception, which is grounded in interests of public safety. *State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, 47 N.E.3d 821, ¶ 20; *see also State v. Banks-Harvey*, 152 Ohio St.3d 368, 2018-Ohio-201, 96 N.E.3d 262, ¶ 50 (Kennedy, J., concurring in judgment). Under this exception, police officers may make a warrantless entry into a home when (1) the police have "reasonable grounds to believe that there is immediate need" to protect the lives or property of themselves or others; (2) the circumstances, as viewed objectively, justify the warrantless entry; and (3) there is a reasonable basis, short of probable cause, to

associate the place to be searched with an emergency. *State v. Griffin*, 2d Dist. Montgomery No. 25431, 2013-Ohio-3036, ¶ 26, quoting *State v. Baker*, 9th Dist. Summit No. 23713, 2009-Ohio-2340, ¶ 7.

{¶ 35} "[C]ommunity caretaking functions" are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). Consequently, "if law enforcement officers happen to be in an otherwise protected area while performing a community-caretaking function and see or discover evidence in furtherance of that function, it is not a constitutional violation, because the intrusion is reasonable." *State v. Stoermer*, 2d Dist. Clark No. 2017-CA-93, 2018-Ohio-4522, ¶ 14.

{¶ 36} The trial court concluded that Officer Davis's entry on the Glowneys' yard and her seizure of Dyson were reasonable based on the community caretaking exception. The court reasoned:

> The credible unrefuted testimony of Officer Davis and Deborah Smith indicates that the dog was running at large before wandering into the yard at 636 Cushing. The dog had no current or other discernible registration information on its collar, and neither Officer Davis no[r] Deborah Smith were able to determine with certainty who were the dog's owners or whether 636 Cushing was in fact the dog's home.

> It was Officer Davis's duty as an Animal Control Officer to seize unregistered dogs running at large and she committed no violation of law in seizing an animal from a yard where it wandered after running loose through the neighborhood. Under such circumstances she was not required to

obtain a warrant to seize the dog. She was clearly engaged in a community caretaking function, not a criminal investigation.

**{¶ 37}** We agree with the trial court's conclusion. With the benefit of hindsight, it is now known that Dyson was in his own backyard when Officer Davis went into the Glowneys' backyard and seized him. However, based on the information available to the officer on October 10, Dyson had been on the street and then run into the backyard of 640 Cushing before going into the backyard of 636 Cushing. Based on Officer Davis's experience, she could not assume, based on Dyson's behavior of trying to get into the house at 636 Cushing, that he necessarily lived there. Dyson was not confined, and neither Officer Davis nor Smith nor the other neighbor was aware of Dyson's ownership. Accordingly, Officer Davis reasonably entered the Glowneys' backyard to seize him.

**{¶ 38}** In doing so, Officer Davis was exercising community caretaking functions. With a stray dog, the public faced the risk of injury from a possibly dangerous and/or unvaccinated dog. Concomitantly, as an unconfined animal, Dyson faced a risk of injury from vehicular traffic, lack of food, water, or shelter, or other environmental dangers. Officer Davis's entry into the backyard of 636 Cushing reasonably addressed the concerns raised by a loose dog, particularly one whose ownership was then unknown. In short, Officer Davis's actions were reasonably necessary for the safety of both the public and Dyson. Her seizure of Dyson was thus a reasonable exercise of her community caretaking duties, and her actions did not violate the Fourth Amendment. *Accord Massachusetts v. Duncan*, 467 Mass. 746, 7 N.E.3d 469 (2014) (emergency aid exception to constitutional warrant requirement extends to police action undertaken to render emergency assistance to animals).

**B**. **Due Process**

**{¶ 39}** The Glowneys also argue that Officer Davis's actions were unconstitutional, because the officer failed to comply with R.C. 959.132.   R.C. 959.132(B) authorizes an officer, including an animal control officer, to seize and cause to be impounded at an impounding agency a companion animal that the officer has probable cause to believe is the subject of an offense.   "Offense" means, as relevant here, a violation of R.C. 959.131, cruelty against companion animal.   Dogs, regardless of where they are kept, are companion animals.   R.C. 959.131(A).   R.C. 959.132 further provides:

> (C) The officer shall give written notice of the seizure and impoundment to the owner, keeper, or harborer of the companion animal that was seized and impounded.  If the officer is unable to give the notice to the owner, keeper, or harborer of the companion animal, the officer shall post the notice on the door of the residence or in another conspicuous place on the premises at which the companion animal was seized.  *The notice shall include a statement that a hearing will be held not later than ten days after the notice is provided or at the next available court date to determine whether the officer had probable cause to seize the companion animal and, if applicable, to determine the amount of a bond or cash deposit that is needed to provide for the companion animal's care and keeping for not less than thirty days beginning on the date on which the companion animal was impounded.*
>
> (D) A companion animal that is seized under this section may be humanely destroyed immediately or at any time during impoundment if a

licensed veterinarian determines it to be necessary because the companion animal is suffering.

(Emphasis added.)

**{¶ 40}** The trial court concluded that R.C. 959.132(C) did not apply in this case, because Dyson was a dog at large at the time he was seized, and the seizure "had nothing to do with an animal cruelty offense or investigation." We likewise question whether R.C. 959.132(C) is applicable. Although Officer Davis seized Dyson as a dog at large, which is a violation of a Kettering ordinance, R.C. Chapter 959 does not contain a comparable animal at large offense. Officer Davis testified that Dyson was not seized due to suspected animal cruelty, an offense under R.C. 959.131.

**{¶ 41}** Regardless, even assuming for sake of argument that Officer Davis was required to provide the notification described in R.C. 959.132(C), the failure to do so did not constitute a constitutional violation requiring the suppression of evidence or dismissal of charges. Officer Davis provided the Glowneys with a written notice at their residence, noting that their pet was an animal at large and directing them to contact her regarding his condition. Officer Davis indicated the date and time on the notice and provided her contact information. Officer Davis's notice did not provide information about the right to a hearing (again, assuming that such a notice were required), but the failure to include this information did not affect the constitutionality under the Fourth Amendment of Officer Davis's seizure of Dyson on October 10, 2016.

**{¶ 42}** Moreover, we have previously held that the exclusionary rule need not be applied to statutory violations that fall short of constitutional violations. *E.g., State v. Kirkland*, 2d Dist. Montgomery No. 26272, 2015-Ohio-1978, ¶ 23 (even if defendant's

offense had not been observed by officers and his warrantless arrest was contrary to R.C. 2935.03(A)(1), there was no constitutional violation that required suppression of the evidence); *State v. Mason*, 2d Dist. Montgomery No. 20243, 2004-Ohio-5777, ¶ 21, citing *State v. Neal*, 2d Dist. Montgomery App. No. 7426, 1982 WL 4855 (Jan. 28, 1982). With the record before us, there was no constitutional violation with respect to the initial seizure of Dyson.

{¶ 43} The Glowneys further argue that their constitutional rights were violated when ARC failed to provide them a hearing prior to the euthanasia of Dyson. The State claims this argument was waived, because the Glowneys did not raise it in their motion to suppress. The Glowneys' motion to suppress repeatedly argued that Dyson was destroyed without their consent or knowledge, and their post-hearing memorandum (Doc. #74) expressly argued that ARC's euthanasia of Dyson "without notifying the Glowneys in advance and seeking their permission to put him down" violated their constitutional rights. We conclude that the issue was adequately raised. Nevertheless, even if we were to assume, for sake of argument, that the Glowneys were entitled to a hearing prior to Dyson's euthanasia, we conclude that the exclusionary rule does not provide a remedy for that alleged procedural due process violation in this criminal case.

{¶ 44} Finally, the Glowneys claim that Dyson's collar and license "should have been preserved – if for nothing else, the sentimental value it had for Dyson's parents."

{¶ 45} The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects a criminal defendant from being convicted when the State either fails to preserve materially exculpatory evidence or destroys, in bad faith, potentially useful evidence. *E.g., State v. White*, 2015-Ohio-3512, 37 N.E.3d 1271, ¶ 58 (2d Dist.).

Evidence is "materially exculpatory" if it (1) possesses "an exculpatory value that was apparent before the evidence was destroyed" and (2) is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 74.

{¶ 46} "In contrast, evidence is not materially exculpatory if it is merely potentially useful. Potentially useful evidence indicates that the evidence may or may not have incriminated the defendant. The failure to preserve evidence that by its nature or subject is merely potentially useful violates a defendant's due process rights only if the police or prosecution acted in bad faith." *State v. Cox*, 2d Dist. Montgomery No. 25477, 2013-Ohio-4941, ¶ 88. "The term 'bad faith' generally implies something more than bad judgment or negligence. 'It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud.' " (Citations omitted.) *Powell* at ¶ 81.

{¶ 47} Under current case law, the defendant bears the burden to prove that the evidence in question was materially exculpatory, not merely potentially useful. *Id.* at ¶ 74; *see also State v. McClain*, 2016-Ohio-838, 60 N.E.3d 783 (expressing disagreement with *Youngblood*'s bright-line test).

{¶ 48} We are not unsympathetic to the Glowneys' concerns. However, the Glowneys have not asserted that the collar and license constituted materially exculpatory or potentially useful evidence, nor have they articulated how the loss of the collar and license affected this criminal prosecution. We find no constitutional violation based on ARC's loss of Dyson's collar and license to warrant the suppression of evidence or the

dismissal of the charges against the Glowneys.

{¶ 49} The Glowneys' first, second, and third assignments of error are overruled.

### III. Plea Hearing

{¶ 50} The Glowneys claim that the trial court failed to comply with Crim.R. 11 and R.C. 2937.07 when it accepted their no contest pleas.   Specifically, they assert that the trial court failed to comply with the requirements regarding an explanation of the circumstances.   The Glowneys claim that double jeopardy attaches, and the remedy should be complete discharge of the charges.

### A. Transcript of Plea Hearing

{¶ 51} As an initial matter, the Glowneys claim in their fifth assignment of error that the trial court erred in amending the transcript of the plea hearing to reflect that Mrs. Glowney consented to the waiver of an explanation of circumstances.

{¶ 52} App.R. 9(E) allows for the trial court to correct errors in the record if anything material "is omitted from the record by error or accident or is misstated."   The rule provides that "[i]f any difference arises as to whether the record truly discloses what occurred in the trial court, the difference shall be submitted to and settled by the trial court and the record made to conform to the truth."   "Once the appellate court remands a case to the trial court on an App.R. 9(E) motion, the decision of whether the record of proceedings should be corrected or supplemented is within the discretion of the trial court."   *State v. Cross*, 7th Dist. Mahoning No. 07-MA-74, 2008-Ohio-3240, ¶ 33, citing *State v. Cook*, 10th Dist. Franklin No. 05AP-515, 2006-Ohio-3443, ¶ 30.   An appellate court will not reverse a trial court's decision concerning correction of the record absent an abuse of discretion.   *State v. Keene*, 2d Dist. Montgomery No. 14375, 1996 WL 531606,

*64 (Sept. 20, 1996), citing *State v. Schiebel*, 55 Ohio St.3d 71, 82, 564 N.E.2d 54 (1990). An abuse of discretion occurs when the trial court's decision is unreasonable, arbitrary, or unconscionable. *State v. Turner*, 2d Dist. Montgomery No. 27350, 2017-Ohio-4101, ¶ 5, citing *State v. Jenkins*, 2d Dist. Montgomery No. 27173, 2017-Ohio-1073, ¶ 10.

**{¶ 53}** Upon our remand to the trial court, the State moved to correct the transcript of the January 25, 2018 plea hearing, arguing that the transcript did not include Mrs. Glowney's response to whether the parties would waive a reading of the explanation of circumstances. In its ruling, the trial court stated that it had reviewed the video recording of the plea hearing and "does hereby find that the Transcript of Proceedings does not truly disclose what occurred before the Court at the time of the plea." The court continued:

* * * At the time of the plea hearing the Court posed the following question

to Defendants, Joshua and Lindsey Glowney:

I know you both – everybody here is very familiar with the

circumstances in this case but there is some law to the effect

that that should be read into the record in open court unless

the parties waive having that happen here this afternoon. So

you're okay with us not reading that it?

Both of the Glowneys responded at the same time, with Mr. Glowney

replying, "Yes, sir," and Mrs. Glowney saying, "Yes." Perhaps because Mr.

Glowney's "Yes sir" response was spoken much louder than Mrs. Glowney's

simultaneous "yes" response, Mrs. Glowney's softer, but still audibly

discernable response to the Court's question is not included in the January

25, 2018 Transcript of Proceedings.

The trial court ordered an amended transcript to be prepared, reflecting that Mrs. Glowney's response to the Court's question was "yes," and the amended transcript filed. The Glowneys asked the court to reconsider its ruling, arguing that neither defense counsel nor the court reporter who prepared the original transcript heard Mrs. Glowney's response; defense counsel requested a hearing on the State's motion to correct the record. The trial court denied the Glowneys' motion for reconsideration.

**{¶ 54}** We find no abuse of discretion in the trial court's rulings. The video recording of the plea hearing is not part of the record, and we have no basis to evaluate whether Mrs. Glowney's response is or is not discernible. The trial court indicated that it had reviewed the video recording of the plea hearing, and it concluded that Mrs. Glowney's gave an affirmative response, albeit in a softer voice than her husband's. On the record before us, the trial court's decision and its denial of the Glowneys' motion for reconsideration were not an abuse of discretion.

**{¶ 55}** The Glowney's fifth assignment of error is overruled.

**B. Compliance with Crim.R. 11 and R.C. 2937.07**

**{¶ 56}** The requirements for a no contest plea in felony cases differ from those for a no contest plea in misdemeanor cases. Under Crim.R. 11(E), in misdemeanor cases involving petty offenses,[5] such as this case, "the court may refuse to accept a plea of

---

[5] A "petty offense" is "a misdemeanor other than a serious offense." Crim.R. 2(D). A "serious offense" means "any felony, and any misdemeanor for which the penalty prescribed by law includes confinement for more than six months." Crim.R. 2(C). The maximum penalty for a second-degree misdemeanor is 90 days in jail. R.C. 2929.24(A)(2). Accordingly, the Glowneys' offense constituted a "petty offense" under Crim.R. 11.

guilty or no contest, and shall not accept such pleas without first informing the defendant of the effect of the plea of guilty, no contest, and not guilty." In addition, pursuant to R.C. 2937.07, the trial court in a misdemeanor case is required to hear an explanation of the circumstances surrounding the offense and then determine whether the facts are sufficient to convict on the misdemeanor offense. *See State v. Adams*, 2d Dist. Montgomery No. 22493, 2009-Ohio-2056, ¶ 14.

**{¶ 57}** The Supreme Court of Ohio has held that "the provision in R.C. 2937.07 requiring an explanation of circumstances following a plea of no contest [in a misdemeanor case] has not been superseded by the enactment of Crim.R. 11 because the statutory provision confers a substantive right." *Cuyahoga Falls v. Bowers*, 9 Ohio St.3d 148, 151, 459 N.E.2d 532 (1984); *see also Girard v. Giordana*, 155 Ohio St.3d 470, 2018-Ohio-5024, 122 N.E.3d 151, ¶ 15 ("[T]he explanation-of-circumstances requirement exists to provide an extra layer of procedural protection to the defendant.").

**{¶ 58}** "The statutorily required explanation of circumstances does not mandate that sworn testimony be taken but instead only contemplates some explanation of the facts surrounding the offense [so] that the trial court does not make a finding of guilty in a perfunctory fashion." *State v. Jasper*, 2d Dist. Greene No. 2005 CA 98, 2006-Ohio-3197, ¶ 32, citing *Bowers* at 151. The explanation "necessarily involves, at a minimum, some positive recitation of facts which, if the court finds them to be true, would permit the court to enter a guilty verdict and a judgment of conviction on the charge to which the accused has offered a plea of no contest." *State v. Osterfeld*, 2d Dist. Montgomery No. 20677, 2005-Ohio-3180, ¶ 6.

**{¶ 59}** The State bears the burden of ensuring that an explanation of

circumstances appears on the record before a conviction is entered. *State v. Schornak*, 2015-Ohio-3383, 41 N.E.3d 168, ¶ 8 (2d Dist.). However, it is immaterial who actually states the explanation on the record. *Id.* Regardless of who states the explanation of circumstances, the record must affirmatively demonstrate that a sufficient explanation of circumstances was made. *Id.*

{¶ 60} An explanation that merely restates the statutory elements of the offense is insufficient. *State v. Wieckowski*, 2d Dist. Clark No. 2010-CA-111, 2011-Ohio-5567, ¶ 4. And, the explanation of circumstances requirement "is not satisfied by a presumption that the court was aware of facts which may be gleaned from a review of 'the available documentation.' " *State v. Keplinger*, 2d Dist. Greene No. 98-CA-24, 1998 WL 864837, *3 (Nov. 13, 1998), quoting *Bowers* at 151.

{¶ 61} Many Ohio appellate districts permit a waiver of the explanation of circumstances requirement. *See Schornak*, ¶ 12 (citing cases from other districts that permit waiver of the explanation of circumstances); *State v. Fields*, 2017-Ohio-400, 84 N.E.3d 193 (2d Dist.). Nevertheless, we have held that a defendant's stipulation of guilt upon pleading no contest does not, by itself, waive the requirement. *Schornak* at ¶ 12; *State v. Roland*, 2d Dist. Champaign No. 2005 CA 39, 2006-Ohio-3517.

{¶ 62} At the plea hearing, the trial court explained the constitutional rights that the Glowneys were waiving by entering a plea, the effect of a no contest plea, and that "there is an understanding between counsel that there is a sufficient basis upon which the court will enter a guilty finding on your no contest pleas, but those cannot be used against you in any other matter pertaining to this – any other proceedings pertaining to this matter"; the Glowneys expressed their understanding. The trial court then asked, "[D]o you waive

having the court read into the record the facts of the complaints to which you are pleading no contest?" The Glowneys each responded, "Yes." The court informed the Glowneys that the animal cruelty charge was a second-degree misdemeanor and of the potential maximum penalty for that offense. The Glowneys again expressed their understanding and stated that they wished to plead no contest to the cruelty to animals charge.

{¶ 63} At that juncture, the prosecutor asked whether defense counsel waived the explanation of circumstances for both of his clients. After a short discussion, defense counsel stated, "I waive the reading." (Amended Plea Hearing Tr. at p. 8) The court then asked the Glowneys if they "were okay with us not reading that." Both Mr. and Mrs. Glowney responded affirmatively. (*Id.* at 9.) The court then stated:

> The record should reflect that the court has become very familiar with this case, has had an opportunity on numerous occasions to review the complaints, the underlying facts, the legal issues and – and I do find that there is a sufficient basis upon which to enter a guilty finding on each of your no contest pleas. And accordingly, the court will enter that finding.

{¶ 64} On appeal, the Glowneys argue that the court erred in failing to ask for an explanation of circumstances prior to the Glowneys' entry of their no contest pleas. They argue that the explanation of circumstances was "intended to make sure that the Defendants-Appellants understand the material facts related to the elements of the alleged crime. It gives the Defendants-Appellants, and their legal counsel, an opportunity to determine if sufficient facts exist to satisfy each and every element of the crime with which they stand charged."

{¶ 65} We disagree with the Glowneys' contention that the primary purpose of the

explanation-of-circumstances requirement is to ensure a *defendant's* understanding of the charge. As expressed by the Ohio Supreme Court, the explanation-of-circumstances requirement ensures that a *judge* does not find a defendant guilty in a perfunctory manner. *Bowers*, 9 Ohio St.3d at 151, 459 N.E.2d 532. It "allows a judge to find a defendant not guilty or refuse to accept his plea when the uncontested facts do not rise to the level of a criminal violation." *Giordana*, 155 Ohio St.3d 470, 2018-Ohio-5024, 122 N.E.3d 151, at ¶ 18. The trial court did not err when it addressed the explanation of circumstances after the Glowneys expressed their desire to plead no contest. Rather, the trial court appropriately considered the explanation of circumstances at that time in determining whether to find the Glowneys guilty on their no contest pleas.

{¶ 66} The Glowneys further argue that the trial court erred in failing to recite an explanation of the circumstances supporting their convictions. They characterize the plea hearing as a "ball of confusion." Upon our review of the plea hearing transcript, we find no confusion. Prior to the Glowneys' entry of their no contest pleas, the trial court asked them if they waived a reading of the facts of the complaint, which would have informed them of the facts alleged in the complaint to which they were pleading. After stating that they wished to enter no contest pleas, they waived an explanation of the circumstances, which would have provided the trial court with some explanation of the facts surrounding the offense and permitted the trial court to determine whether the circumstances were sufficient to establish the Glowneys' guilt. The plea hearing transcript further reflects that counsel had agreed there was a sufficient basis upon which the court would enter a guilty finding based on the no contest pleas.

{¶ 67} The Sixth District has held that, "[i]f the defendant's waiver of the

explanation of circumstances is accompanied with an express statement that the defendant consents to a finding of guilty or expressly stipulates that the admitted facts provide a sufficient or actual basis for a finding of guilt, then the defendant cannot assert insufficient evidence as error on appeal." *State v. Neal*, 6th Dist. Lucas No. L-17-1193, 2018-Ohio-2596, ¶ 18. We find that is the case here. The Glowneys waived a reading of the facts of the complaint, waived a recitation of the explanation of circumstances, and agreed that there was a sufficient basis upon which to find them guilty. Under these circumstances, the trial court did not err in accepting their no contest pleas and convicting them on their no contest pleas to cruelty against companion animal.

**{¶ 68}** The Glowneys' fourth assignment of error is overruled.

### IV. Conclusion

**{¶ 69}** The trial court's judgments will be affirmed.

. . . . . . . . . . . . .

HALL, J. and TUCKER, J., concur.

Copies sent to:

Nolan C. Thomas
Paul R. Leonard
Hon. Frederick W. Dressel